UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

**ALBERTO MARINO,**

     **Plaintiff,**

vs.

**SCHENKER, INC.**

     **Defendant.**

_____/

$0 4 - 2$

CIV - UNGARO - BENAGES

MAGISTRATE JUDGE
BROWN

## NOTICE OF REMOVAL

TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

     Defendant Schenker, Inc. ("defendant") a New York corporation with its principal place of business located at 150 Albany Avenue, Freeport, New York 11520, by and through its attorneys, Holland & Knight, LLP, respectfully says:

     1.    Plaintiff Alberto Marino ("plaintiff"), residing at 9810 East Calusa Club Drive, Miami, Florida 33186, commenced the above-captioned action on or about January 22, 2004, by filing a Summons and Complaint in the Circuit Court of the 11th Judical Circuit in and for Miami-Dade County, Florida, General Jurisdiction Division, entitled <u>Alberto Marino v. Schenker, Inc.</u>, Case No. 04-01623-CA-01. Said action is now pending in that Court.

     2.    On January 26, 2004, plaintiff served copies of the Summons and Complaint upon defendant. Receipt of the Summons and Complaint on that date was defendant's first notice of the existence of a filed pleading containing a claim for relief asserted by plaintiff which could be



Case 1:04-cv-20234-JLK    Document 1    Entered on FLSD Docket 02/02/2004    Page 2 of 42

Marino vs. Schenker – Notice of Removal
Page 2

removed to this Court.   A copy of each of the foregoing papers, which constitute all of the processes and pleadings to date, are annexed hereto as Exhibit A.

3.    The above-captioned action is a civil action over which the Court has original jurisdiction under the provisions of 28 U.S.C. ' 1332, and is one which may be removed to this Court by defendant pursuant to the provisions of 28 U.S.C. ' 1441, in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.    This Notice of Removal is filed within the time provided by 28 U.S.C. ' 1446(b) and the Federal Rules of Civil Procedure.

5.    Upon the filing of this Notice of Removal, defendants shall give written notice thereof to Michael J. Reppas, II, Esq., Fowler, Rodriguez & Chalos, LLP, attorneys for plaintiff, and defendant shall file copies of said Notice and Notice of Filing of Removal, with the Clerk of the Circuit Court, Miami-Dade County Courthouse, 73 West Flagler Street, Suite 242, Miami, Florida 33130.

6.    By filing this Notice, defendant does not waive any defenses which may be available to it, specifically including, but not limited to, improper service of process and the absence of venue in the Court from which this action has been removed.

Case 1:04-cv-20234-JLK   Document 1   Entered on FLSD Docket 02/02/2004   Page 3 of 42

Marino vs. Schenker – Notice of Removal
Page 3

WHEREFORE, defendant Schenker, Inc. removes the above-captioned action now pending against it in the Circuit Court of the 11th Judical Circuit in and for Miami-Dade County, Florida, General Jurisdiction Division, to the United States District Court for the Southern District of Florida, Miami Division, wherein it shall proceed as an action originally commenced therein.

Dated: January 30 , 2004

Respectfully submitted,

Holland & Knight LLP
Attorneys for Defendants
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Phone: (305) 374-8500
Fax: (305) 789-7799

Marilyn J. Holifield
Florida Bar No. 293482
**mholifie@hklaw.com**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by U.S. Mail upon: Michael J. Reppas, II, Esq., Fowler, Rodriguez & Chalos, LLP, Gables International Plaza, 2655 LeJeuene Road, Suite 805, Coral Gables, Florida, 33134, on January 30 , 2004.

Marilyn Holifield

# 1560440_v1

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:      04   01329   CA 04

ALBERTO MARINO,

    Plaintiff,

vs.

SCHENKER, INC.

    Defendants.

_____/

V. Pauk #395

**SUMMONS**

1-26-04

3:up

THE STATE OF FLORIDA
To Each Sheriff Of The State:

    YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

        SCHENKER, INC.  C/O CT corp
        10400 NW 21ST STREET  1200 s. pine islands
        MIAMI, FLORIDA 33172  Plantation fl 11b

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Michael Reppas, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, within 20 days after

service of the Summons on the Defendants, exclusive of the day of service, and to file the original of the

defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.

If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the

Complaint.

interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez ___20___ jours consecutifs a partir de la date de l'assignation de cette citation pour deposer a reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'um avocat. Si vous ne connaissez pas d'avocar, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

04  01623  CA04

ALBERTO MARINO,

    Plaintiff,

vs.

SCHENKER, INC.

    Defendants.

_____/

## COMPLAINT

COMES NOW, the Plaintiff, Alberto Marino ("Marino"), by and through his undersigned attorneys, and files this Complaint against the Defendant, Schenker, Inc. ("Schenker"), and avers:

1.    This is an action for Fraud and an action under the Florida Civil Rights Act of 1992 (Fla. Stat. §§ 760.01-760.11 and 509.092 (2003)) to correct unlawful employment practices based on national origin and retaliation and to make whole, Plaintiff, Alberto Marino.

2.    The causes of action asserted herein arose in Miami-Dade County, Florida.

3.    Plaintiff, ALBERTO MARINO is an individual who is *sui juris* and who, at all times relevant hereto has been, a resident of the State of Florida, County of Miami-Dade.

4.    Defendant, Schenker, Inc., ("Schenker") is, and at all times relevant hereto, has been, a for profit corporation authorized to do business throughout the State of Florida.

5.    At all relevant times, Schenker has continuously been doing business in the State of Florida and in Miami-Dade County and continuously has had at least fifteen (15) employees.

6.      At all relevant times, Schenker has continuously been an employer within the meaning of Fla. Stat. §§ 760.02.

## FACTS COMMON TO ALL CAUSES OF ACTION

7.      Plaintiff, Alberto Marino, Sr. ("Marino"), has satisfied all conditions precedent to this action.

8.      Marino is a 62 year old man who is of Cuban national origin.

9.      Marino has been in the freight forwarding business for 41 years. For 27 years Plaintiff, Mr. Marino, owned two freight forwarding companies known as Almar International, Inc. ("Almar") and Victoria Line, Inc. ("Victoria")(hereinafter collectively referred to as "Plaintiff's businesses").

10.      Plaintiff's businesses were located in a warehouse office space (hereinafter "Warehouse") of 100,800 square feet, having an address of 10605 N.W. 21st Street, Miami, Florida.

11.      Plaintiff was in possession of the Warehouse through a Commercial/Industrial Building Lease, dated August 20, 1998 (hereinafter the "Original Lease").

12.      The Original Lease was for a term of ten years (i.e., through June 30, 2009) at a price of approximately Six Dollars and Fifty Cents ($6.50) per square foot.

13.      On or about December 1, 2000, Schenker and Plaintiff entered into an employment agreement ("the Agreement") whereby Defendant agreed, *inter alia*, to employ Plaintiff for a three (3) year period. Said Agreement is attached hereto as Exhibit "1."

14.      Plaintiff's employment was effective on January 2, 2001.

15.      The Contract called for an automatic termination of Plaintiff's employment on November 30, 2003. Plaintiff was to receive an annual salary of $100,000.00 per year, along

with commissions on sales, and a benefits package, including, but not limited to: a monthly automobile allotment, health and dental insurance, and a retirement plan.

16.    In order to enter into the employment Agreement with the Plaintiff, the Plaintiff was required by Schenker to simultaneously enter into a sublease of the Warehouse to Schenker (hereinafter the "Sublease"). The Sublease was entered into between the parties on November 30, 2000. A true and correct copy of same is attached hereto and marked as Exhibit "2."

17.    The Sublease was for a term of five years (beginning on January 1, 2001 and terminating on December 31, 2005). The rent for the Warehouse in the Sublease, was exactly the same as was contained in the Original Lease (*i.e.*, approximately Six Dollars and Fifty Cents ($6.50) per square foot).

18.    Mr. Marino could have subleased the Warehouse to another company(ies) at a substantially higher rent, however, he entered into the Sublease with Schenker in detrimental reliance on Schenker's relayed intent to comply with the spirit, terms and conditions of the employment Agreement.

19.    After taking possession of the Warehouse under the Sublease, Defendant failed to honor the terms of the Agreement and wrongfully terminated Mr. Marino.

20.    The Agreement provided that Defendant could only terminate Plaintiff for "Serious Cause" as defined in paragraph 10.3, or "Other Cause" as defined in Paragraph 10.4. "Serious Cause" is defined in the Contract as "(i) material breach of his duties, or (ii) intentional misconduct, or (iii) taking any action involving personal dishonesty which affects Defendants, or its business". "Other Cause" is a "good faith determination by the President of Schenker that

Employee has failed to satisfactorily perform his duties and responsibilities". *See,* paragraphs 10.3 and 10.4 of the Agreement attached as Exhibit "1."

21.     Under Paragraph 10.4, Plaintiff must be notified in writing of Defendant's intention to terminate, pursuant to other "Cause" and Plaintiff had thirty (30) days to cure or correct the "Other Cause" relied upon by Defendant for the intended termination.

22.     The Agreement gives Plaintiff the right to terminate: Paragraph 10.2 states that Plaintiff may terminate his employment with Defendant by giving Defendant thirty (30) days prior written notice for Good Reason. "Good Reason" is defined as a reduction in salary or a breach of the Contract by Defendant. If Plaintiff terminates for "Good Reason", his salary and commissions continue as provided by the Contract.

23.     On or about September 12, 2002, Plaintiff was sent a letter by Defendant, (the "Ohlrich Letter") signed by Peter Ohlrich, Chief Financial Officer of Schenker. The Ohlrich Letter appeared to be an attempt to give Plaintiff 30 days written notice of a reason for termination under Paragraph 10.4 of the Contract, and an untruthful and veiled attempt at notice under Paragraph 10.3 of the Contract. The Ohlrich Letter outlined three issues that Defendant claimed needed to be addressed, and threatened termination of Plaintiff's employment with Defendant.

24.     The statements contained in the Ohlrich letter -besides being entirely false- were simply a pretext for the real reason Defendant attempted to and finally did terminate Plaintiff. Defendant's discriminatory animus against Plaintiff, together with Defendant's complete violation of the terms and conditions of the Agreement, and its desire to terminate the payments it is obligated to make to Plaintiff.

25.     By letter dated October 17, 2002, Defendant unlawfully terminated Plaintiff and purported to do so under the "Other Cause" provision in the contract.

26.     Mr. Marino was at all times an excellent employee and fulfilled his obligations under the Agreement. Plaintiff had every reason to believe that his employment would continue under the terms of the Agreement. The termination by Defendant violated the spirit, terms and conditions of the Agreement.

27.     Since at least May 15, 2001, Schenker has engaged in unlawful employment practices at its facilities in Miami-Dade County in violation of Florida Civil Rights Act of 1992, as amended. Specifically, Schenker has discriminated against employees of Hispanic national origin by prohibiting them from speaking Spanish at any time at its facilities in Miami-Dade County. When employees opposed this unlawful policy, they were subjected to retaliation including discharge and constructive discharge.

28.     Mr. Marino was also passed over for promotion by Schenker, and ultimately terminated by Schenker, because of his age. Accordingly, Schenker has engaged in unlawful employment practices at its facilities in Miami-Dade County in violation of Florida Civil Rights Act of 1992, as amended.

29.     The effect of these policies and conduct has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of national origin, age and retaliation.

30.     Mr. Marino timely filed a charge of employment discrimination with the State of Florida Commission on Human Relations.

31.     The State of Florida Commission on Human Relations issued a notice of right to sue on January 15, 2004. .A true and correct copy of same is attached hereto and marked as Exhibit "3."

## FIRST CAUSE OF ACTION

### (Fraud Against Defendant)

32.     Plaintiff hereby realleges and incorporates by reference herein paragraphs one (1) through thirty-one (31) of this Complaint, as if they were fully repeated here.

33.     This is an action for fraud.

34.     The Defendant defrauded Plaintiff by inducing him to enter into a Sublease for the Warehouse facilities of his businesses under the guise of employing him for a three (3) year term in its Miami-Dade County branch office. Defendant did this in order to pay less than fair market value for the sublease of Plaintiff's Warehouse facilities.

35.     The Defendant had no intention of complying with the terms of the Agreement when the Defendant entered into the Sublease with Plaintiff. The Defendant only intended to defraud the Plaintiff of the value of his Warehouse and then to illegally terminate Plaintiff.

36.     The Defendant made false representations as to their intent to honor the terms of the Agreement with the Plaintiff.

37.     These representations were of a material fact made with knowledge of their falsity or made without knowledge as to their truth or falsity or made under circumstances in which Schenker ought to have known of their falsity.

38.     Schenker made these representations with the intention of inducing the Plaintiff to act upon the representations and to enter into the Agreement and Sublease.

39.     In accordance with Fla.R.Civ.P. 1.120(b), Mr. Marino asserts that these and

other representations were made by and through Schenker's officers, directors and/or agents,

prior to and after the execution of the Agreement, over the course of several months as part of

and in the context of entering into the employment Agreement and other contracts with the

Plaintiff on the dates provided below:

- There were two or three informal meetings before November 27th 2000 with Gary Elsesser, Chairman of the Board for Defendant, Schenker.

- Monday, November 27, 2000
  Andreas Rothe, Director of Defendant, Schenker
  Walter Monasterio, Branch Manager of Defendant, Schenker

- Wednesday, November 29, 2000
  Lawrence Cantor, Regional Controller of Defendant, Schenker
  Steve Gifford, Controller East USA of Defendant, Schenker

- Friday, December 1, 2000
  Gary Elsesser, Chairman of the Board of Defendant, Schenker
  Hartmut Luehr, President & CEO of Defendant, Schenker

- Tuesday, December 5, 2000
  Walter Monasterio, Branch Manager of Defendant, Schenker

- Wednesday, December 6, 2000
  Jeffrey Constable, Director Corporate Imports of Defendant, Schenker

- Specific date unavailable, however, it was likely between December 6-8, 2000
  Stephan Weber, Vice-President Seafreight America's
  Daniel Sanvicente, Business Analyst of Defendant, Schenker

- Friday, December 8, 2000
  Cristina Fuentes, Operation Manager of Defendant, Schenker

- Friday, December 8, 2000
  Gary Elsesser, Chairman of the Board of Defendant, Schenker
  Francis Araya, General Manager, Baimar International, San Jose, Costa Rica.

- Monday, December 11, 2000
  Trip to Guatemala with Gary Elsesser, Chairman of the Board of Defendant, Schenker, to meet with LTL International.

- Tuesday, December 14, 2000
  Trip to Costa Rica with Gary Elsesser, Chairman of the Board to meet with
  Baimar International.

- Thursday, December 14, 2000
  Michael Callahan, Vice-President of Human Resources of Defendant,
  Schenker

- Tuesday, December 19, 2000
  Walter Monasterio, Branch Manager of Defendant, Schenker
  Stephan Weber, Vice-President Seafreight America's

- Thursday, December 21, 2000
  Gary Elsesser, Chairman of the Board of Defendant, Schenker
  Eddie Joubert, President of Almar/Victoria Agent in Dominican Republic

- Thursday, January 4, 2001
  Peter Santangelo, President, Albion International
  Walter Monasterio, Branch Manager of Defendant, Schenker

- Thursday, January 4, 2001
  Stephen Weber, Vice President Seafreight America's
  George Nevot, Sales Manager, Maersk Lines

- Friday, January 5, 2001
  Stephan Weber, Vice-President Seafreight America's
  Lawrence Cantor, Regional Controller of Defendant, Schenker
  Cesar Aguilar, Almar/Victoria Controller ¿??

- Monday, January 8, 2001
  Andrea Rothe, Director Controlling
  Michael Becker, Assistant Vice-President, Seafreight

- Wednesday, January 10, 2001
  Walter Monasterio, Branch Manager
  Andreas Rothe, Director Controlling of Defendant, Schenker
  Michael Becker, Assistant Vice-President Seafreight America's
  Pedro Abascal, President, Victoria Line, Inc.

- Tuesday, January 16, 2001
  Andrew Dancescu, Vice-President Logistics of Defendant, Schenker
  Frank Woeste, Director Special Projects of Defendant, Schenker

- Wednesday, January 17, 2001
  Gary Elsesser, Chairman of the Board of Defendant, Schenker
  Francisco Montenegro, President, LTL International, Guatemala City
  Guatemala

- Monday, January 29, 2001
  Gary Elsesser, Chairman of the Board of Defendant, Schenker
  Patrick Moebel, President and CEO of Defendant, Schenker
  Peter Santangelo, President, Albion International

40.     The Plaintiff's justifiable reliance on the representations resulted in his injury.

WHEREFORE, Plaintiff demands that a Judgment be entered against the Defendant with

the amount owed to Plaintiff, and all other damages that this Court deems just and appropriate.

## SECOND CAUSE OF ACTION

### (Age Discrimination)

41.     Plaintiff hereby realleges and incorporates by reference herein paragraphs one

(1) through thirty-one (31) of this Complaint, as if they were fully repeated here.

42.     Plaintiff was wrongfully discriminated against and ultimately wrongfully

terminated by Defendant because of his age.

43.     Plaintiff was qualified to perform his job requirements under the subject

Agreement.

44.     Plaintiff was a member of a protected group of persons between the ages of

forty (40) and seventy (70) years old.

45.     Plaintiff was replaced with a person outside of the protected group of persons.

46.     All conditions precedent to bringing this cause of action have been satisfied

by Plaintiff and Plaintiff has received a Notice of Right To Sue from the United States Equal

Employment Opportunity Commission for his national origin discrimination claims. A true and correct copy of which is attached hereto and marked as Plaintiff's Exhibit "3."

WHEREFORE, Plaintiff demands that a Judgment be entered against the Defendant for actual damages, compensatory and punitive damages, attorneys' fees and costs, and all other relief that this Court deems just and appropriate.

## THIRD CAUSE OF ACTION

### (National Origin Discrimination)

47.    Plaintiff hereby realleges and incorporates by reference herein paragraphs one (1) through thirty-one (31) of this Complaint, as if they were fully repeated here.

48.    Plaintiff was wrongfully discriminated against and ultimately wrongfully terminated by Defendant because of his national origin.

49.    Plaintiff was qualified to perform his job requirements under the subject Agreement.

50.    All conditions precedent to bringing this cause of action have been satisfied by Plaintiff and Plaintiff has received a Notice of Right To Sue from the United States Equal Employment Opportunity Commission for his national origin discrimination claims. A true and correct copy of which is attached hereto and marked as Plaintiff's Exhibit "3."

WHEREFORE, Plaintiff demands that a Judgment be entered against the Defendant for actual damages, compensatory and punitive damages, attorneys' fees and costs, and all other relief that this Court deems just and appropriate.

## FOURTH CAUSE OF ACTION

### (Retaliation)

51.       Plaintiff hereby realleges and incorporates by reference herein paragraphs one (1) through thirty-one (31) of this Complaint, as if they were fully repeated here.

52.       The Plaintiff protested what he believed was the unlawful policy instituted by the Defendant.

53.       The Defendant retaliated against the Plaintiff through discharge or constructive discharge.

54.       These actions were done with malice or with reckless disregard of the Plaintiff's federally protected rights.

WHEREFORE, Plaintiff demands that a Judgment be entered against the Defendant for actual damages, compensatory and punitive damages, attorneys' fees and costs, and all other relief that this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury of all issues so triable by right.

Dated  this  22nd  day of January 2004.

FOWLER, RODRIGUEZ, KINGSMILL,
FLINT, GRAY & CHALOS, L.L.P.
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805
Coral Gables, Florida 33134
Tel: 305-445-2930
Fax: 305-445-2450

By: _____
       MICHAEL J. REPPAS II
       Florida Bar No. 124702

Jan-27-04  02:36pm  From-Grotta Glassman Hoffman

12/04/00

## EMPLOYMENT AGREEMENT

THIS AGREEMENT, effective as of December 1, 2000, between Schenker, Inc. ("Schenker "), a New York corporation, and Al Marino, Sr. ("Employee"), sets forth the respective rights and obligations of these parties in connection with the employment of Employee by Schenker.

WHEREAS employee was in the freight forwarding business and had been conducting business through his companies, Almar International, Inc. and Victoria Line, Inc.; and,

WHEREAS employee has decided to no longer conduct business through these entities but rather be employed by Schenker; and,

WHEREAS employee has agreed to sell Schenker the customer list and the accompanying goodwill of Almar International, Inc. and Victoria Line, Inc.

### WITNESSETH:

In consideration of the mutual terms and conditions herein set forth, Schenker and Employee agree as follows:

1.  **PAYMENT FOR CUSTOMER LIST AND GOODWILL**

1.1    Employee hereby sells to Schenker the customer list comprising all of the customers of Almar International, Inc. and Victoria Line, Inc., in addition to the goodwill derived from such customer list.  Said customer list ("Customer List") is attached as Exhibit A. Upon this Agreement being signed by both parties, Schenker shall pay the sum of $104,000 to Employee.  Schenker shall also pay Employee the sum of $150,000 on or about January 15, 2001.  Employee represents that he is the sole stockholder of Almar International, Inc. and

1



EXHIBIT
1

Victoria Line, Inc. and that he has the full authority to make this sale and that both Almar International, Inc. and Victoria Line, Inc. have given the appropriate approvals for Employee to make this sale. Upon payment of said sum, Employee acknowledges that said Customer List becomes the property of Schenker. Employee in further consideration of said sum agrees to take all efforts to ensure that there is an orderly transition of said customers to Schenker. Schenker shall give Employee a 1099 IRS Form for these payments.

1.2    As further consideration for the purchase of said Customer List and accompanying goodwill, Schenker agrees to pay Employee a commission for 5 years commencing as of December 1, 2000 and terminating on November 30, 2005 in accordance with the commission schedule attached as Exhibit B. Said commissions would continue in accordance with Schedule B, even should Employee's employment with Schenker terminate prior to said 5 year period.

1.3    During the month of December 2000, Employee will be devoting his time on closing out all of the outstanding accounts that Almar International, Inc. and Victoria Line, Inc. have so that as of January 2, 2001, Employee can start his employment with Schenker and devote all his energies to generating business for Schenker and making certain that the customers referred to in Paragraph 1.1 become the customers of Schenker. As consideration for the aforementioned, Schenker shall pay Employee the sum of $8,335.00 on or about December 15, 2001. Schenker shall give Employee a 1099 IRS Form for this payment.

## 2.    NATURE AND SCOPE OF DUTIES

2.1    Effective January 2, 2001, Schenker hereby employs Employee as Trade Logistics Director of Schenker and Employee accepts such employment. Further, it is understood that should there be times during Employee's employment that Schenker deems it best for Schenker that Employee's current title and duties be changed, it is agreed by Employee that he shall accept such changes in title and duties provided they remain at an executive level, and subject to Paragraph 4.4, that his compensation, as specified in this Agreement, is not reduced.

D 0036

2

2.2     As Trade Logistics Director of Schenker, Employee shall be responsible for maintaining historical accounts and development of new business. Employee will report to the Branch Manager of Schenker, or such other person as the President of Schenker may designate. The President or Chairman shall review Employee's job title, duties and reporting line on or before June 30, 2001 to decide if there should be any changes to the aforementioned. The decision, if any, shall be in the sole discretion of the President or Chairman.

2.3     During the term hereof, Employee agrees diligently and faithfully, and to the best of Employee's ability, to perform his duties and responsibilities consistent with his position, to devote his entire business time, skill, efforts and energy to the discharge of his duties under this Agreement. Further, Employee shall not during the term hereof be employed in any capacity by any third party or render services to any third party in connection with any commercial venture.

2.4     For the compensation specified in Section 3, Employee agrees to perform such other duties for Schenker as may be assigned to him, from time to time, by the Branch Manager or President of Schenker. Employee also agrees, for the compensation specified in Section 4, to render such services to Schenker's affiliated companies, and if formed, subsidiary companies, joint ventures, and partnerships as may be assigned to him, from time to time, by the Chairman of Schenker.

2.5     Employee's services pursuant to this Agreement are to be performed at Schenker's Miami office.

2.6     Employee acknowledges that he may be required to travel extensively, including visiting Schenker's branch offices, and agrees to make such trips within the United States and abroad as may be required by him in the performance of his duties.

2.7     Notwithstanding anything to the contrary elsewhere in this Agreement, Schenker may, at its option, relieve Employee of his title and all duties and request that

3

D 0037

 

Employee not report to the office. In that situation, Employee shall not take other employment and will remain available for consultation on Schenker matters. During this period, Employee shall continue to receive his compensation and continue to participate in the employee benefit plans. Employee agrees that provided he receives his compensation and continues to participate in the employee benefit plans, such a request shall not constitute a termination, actual, constructive or otherwise and will not constitute a breach of this Agreement by Schenker, and that Employee will not thereby be relieved of any of Employee's commitments as set forth in this Agreement.

### 3.    COMMENCEMENT AND DURATION

3.1     Employee's employment shall be effective as of January 2, 2001. This Agreement shall automatically terminate on November 30, 2003. In the event Employee continues to be employed after November 30, 2003, without another fully executed employment agreement, the employment relationship at such time will be an employment "at will" relationship, and the provisions of this Agreement will continue in force and effect except for Sections 10 and 11.

### 4.    COMPENSATION

4.1     Schenker hereby agrees to pay Employee an annual salary of $100,000 per year, payable in accordance with the normal payroll procedures of Schenker.

4.2     There is no guaranteed bonus; but rather, each year, Employee shall be considered to receive a discretionary bonus. This discretionary bonus, if any, shall be determined at the sole discretion of the Chairman of the Board of Directors after the Chairman considers the personal performance of Employee together with Schenker's performance. Said discretionary bonus, if any, shall be paid 30 days after the later of the Board of Directors approval to pay such bonus or the date Schenker's auditors have submitted their final report of Schenker for the respective fiscal year.

D 0038

 

4.3   All compensation set forth in this Section shall be gross amounts, which shall be reduced by all amounts Schenker is required by law to withhold.

### 5.   EXPENSES

5.1   Schenker agrees to reimburse Employee for necessary and reasonable expenses in performing Employee's duties under this Agreement. Such reimbursements shall be made upon presentation to Schenker of travel and entertainment reports with itemized receipts and such vouchers and other supporting data as Schenker may request. In addition to Schenker's internal travel and entertainment policies, Employee further agrees to comply with the requirements of the Internal Revenue Code and the rules and regulations thereunder in connection with the incurring and reporting of such expenses.

### 6.   VACATION AND OTHER BENEFITS

6.1   Employee shall be entitled to an annual vacation of 20 days. The scheduling of Employee's vacation time shall be subject to the approval of the President of Schenker. In the event Employee was employed less than for the full calendar year, the vacation days will be reduced on a pro-rata basis by multiplying the fraction equal to the number of months not employed (numerator) over twelve months (denominator).

6.2   Employee shall be entitled to the use of an automobile owned or leased by Schenker. Schenker shall bear the operating costs, routine maintenance, and insurance of said automobile, subject to Schenker's policies and procedures. In lieu of the use of an automobile owned or leased by Schenker, Schenker shall have the option to provide Employee a car allowance of $550.00 per month. Any such car allowance will be considered compensation and Employee shall be responsible for paying any taxes on the amounts paid.

6.3 .   Employee shall, when eligible, participate in Schenker's then current employee benefit plans. The current employee benefit plans include the medical/dental insurance plan and 401K plan. Notwithstanding anything to the contrary elsewhere in this Agreement, Schenker

D 0039

5

may change, modify or eliminate any of the employee benefit plans. Such change, modification or elimination shall not be a breach of this Agreement.

## 7. COVENANTS

7.1    Employee agrees that he will not, during the term of his employment pursuant to this Agreement, directly or indirectly conduct or be employed by, act as an independent contractor for, hold an equity or profit sharing interest in, or in any other manner have any business interest in any company conducting any business which directly or indirectly competes with the "business of Schenker " in any geographical market area in which Schenker is at the time engaged or about to engage in business (as used herein, the "business of Schenker " shall mean the business of freight brokering and related transportation services). The aforementioned does not pertain to Employee if he so chooses to invest in any stock of a public corporation registered under the federal securities law and traded on a national exchange.

7.2    In the event Employee terminates his employment with Schenker without Good Reason (as defined in Paragraph 10.2) or Schenker terminates Employee's employment for cause, Employee hereby agrees within a period of three (3) months following such termination not to directly or indirectly:

a) conduct or be employed by, act as an independent contractor for, hold any equity or profit sharing interest in, or in any other manner have any business interest in any third party conducting any business which directly or indirectly competes with the business of Schenker in any geographical market area in which Schenker is at the time engaged, or about to engage in business. Employee acknowledges that for such three-month period, if needed, he will be able to earn a livelihood without violating the restrictions.

b) do business with or solicit for business any third party who is or was a customer or subcontractor of Schenker during the twelve (12) month period immediately prior to the termination of this employment, which could adversely affect such customer's or subcontractor's business relationship with Schenker; and

D 0040

6

 

c) solicit for employment any person who was or is employed by Schenker at any time during the twelve (12) month period immediately prior to the termination of his employment.

7.3     Upon termination of his employment, Employee will immediately return all company property (including but not limited to company auto, cell phone, credit cards and computer lap top) in his possession or control to the company's personnel department.

7.4     Each of the covenants contained in this Section 7 are separate and independent.

8.      CONFIDENTIAL INFORMATION

8.1     Employee agrees, during the term of this Agreement and thereafter, to hold in confidence and not use the secret and confidential internal business affairs of Schenker, Schenker 's parent company and its affiliates, and to keep secret any business and trade secrets of which he may have knowledge (whether such knowledge is acquired before or after the effective date of this Agreement) and regard all books, papers, circulars, etc., related to the business of Schenker, Schenker's parent company, and its affiliates as well as his own business notes, past, present and future, as property of Schenker.  Without limiting the aforementioned "internal business affairs" shall include, but not be limited to the past, present and future financial condition, financial planning, business strategy and other sales or procurement policies of Schenker, Schenker 's parent company and its affiliated companies.

8.2     Upon termination of his employment, Employee will immediately return to Schenker all customer lists and all material, documents, literature and written/printed matter, reports referring to Schenker (including but not limited to, financial information of Schenker, Schenker 's parent company and its affiliated companies, and their subcontractors and customers) as well as his own business notes that are in his possession or control.

9.      ENFORCEMENT OF COVENANTS

D 0041

9.1     Employee acknowledges that any breach or threatened breach by him of any of the covenants set forth in Section 7 or 8 of this Agreement shall cause Schenker irreparable harm for which damages would not be an adequate remedy. Accordingly, in any suit which may be brought by Schenker in any Court relating to any breach or threatened breach of Sections 7 or 8 hereof, Employee consents to the entry of an order enjoining Employee from the creation or continuation of such breach. Such order may be entered during the pendency of such suit as well as after a final determination thereof, without the requirement of posting bond. Any such application for an injunction shall be without prejudice to any other right of action which may be available to Schenker or its successors by reason of any breach or threatened breach of such covenants.

10.     <u>TERMINATION OF EMPLOYMENT</u>

10.1     Employee's employment hereunder shall terminate upon the death of Employee.

10.2     Employee may terminate his employment hereunder upon thirty (30) days' prior written notice to Schenker for Good Reason. For purposes of this Agreement, "Good Reason" shall mean a reduction in Employee's salary (other than as specified in Paragraph 4.3) or other breach of this Agreement that remains uncured for thirty (30) days after receipt of written notice of such breach.

10.3     Schenker may terminate Employee's employment hereunder upon written notice to Employee for Serious Cause. For the purposes of this Agreement, Schenker shall have "Serious Cause" to terminate Employee's employment hereunder based upon Employee's (i) material breach of his fiduciary duties, or (ii) intentional misconduct, or (iii) taking of any action involving personal dishonesty which affects Schenker, or its business.

10.4     Schenker may terminate Employee's employment for Other Cause. For the purpose of this Agreement, Schenker shall have "Other Cause" to terminate Employee's employment hereunder upon a good faith determination by the President of Schenker that Employee has failed to satisfactorily perform his duties and responsibilities; provided, however,

8

D 0042



that Schenker shall give Employee written notice of its intention to terminate his employment. For thirty (30) days after receipt of such written notice Employee shall not be terminated; but rather, he shall have the opportunity to cure or correct the stated Other Cause. Employee shall not be terminated until the earlier of (i) Employee's termination of his efforts to cure or correct the state Other Cause or (ii) 30 days after receipt of written notice by Employee. If Employee cures the stated Other Cause within the foregoing period, Employee's employment shall continue in accordance with this Agreement.

10.5    Schenker has the right to terminate Employee without cause at any time, whereupon Employee shall be entitled to the compensation specified in Paragraph 11.4. In such an instance, Employee shall be entitled to no other compensation or damages.

10.6    The term "Date of Termination" shall mean the earlier of (i) the Expiration Date or (ii) if Employee's employment is terminated by his death, the date of his death; or, (iii) for any other reason stated in this Agreement, the date on which such termination is to be effective pursuant to the notice of termination.

11.    COMPENSATION UPON TERMINATION.

11.1    If Employee's employment is terminated by reason of his death, Schenker shall pay to such person as Employee shall have designated in a notice filed with Schenker, or, if no such person shall have been designated, to his estate, his full Salary through the date of his death.

11.2    If Employee shall terminate his employment for Good Reason (as described in Paragraph 10.2), Schenker shall continue to pay to Employee his Salary and continue the then current health and dental insurance up to November 30, 2003 or at Schenker's option, pay Employee the cash equivalent had he continued under such insurance. Said payment shall be the sole remedy for Employee's termination of his employment for Good Reason.

11.3    If Schenker shall terminate Employee's employment for Serious Cause (as described in Paragraph 10.3) or Other Cause (as described in Paragraph 10.4), Schenker shall

9

D 0043

 

pay Employee his pro-rata Salary up to the Date of Termination at which time all compensation and benefits as specified in this Agreement will cease.

11.4    In the event Schenker terminates Employee's employment without cause (as described in Paragraph 10.5), Employee shall continue to be paid his salary and continue the then current health and dental insurance up to November 30, 2003.   Employee acknowledges that the payment of said sum is his sole remedy for Schenker's termination of his employment without cause.

11.5    Any payments made to Employee by Schenker after termination of Employee's employment by Schenker shall be considered termination benefits in lieu of any severance or any other termination benefits.

11.6    Employee's rights under COBRA shall not be affected by Employee's termination of employment.

12.    REPRESENTATIONS AND WARRANTIES

12.1    Employee represents and warrants:

(a)    He is able to start his employment with Schenker on January 2, 2001.

(b)    He is not a party to any agreement (written or oral) which would restrict him from discussing employment, accepting employment and subsequently being employed by Schenker in any capacity.

c)    He is not a party to any agreement (written or oral) which would restrict him from soliciting any third parties as potential customers, employees or subcontractors of Schenker.

D 0044

10

 

d)      He has the right and power to sell the Customer List (Exhibit A) and accompany goodwill to Schenker.

12.2    In the event any of the above representations is untrue, Employee acknowledges that this could be grounds for immediate termination of his employment. Also, Employee hereby agrees to indemnify Schenker for all expenses, including attorney fees, should any third-party bring a claim against Schenker relating to or connected with a fact or circumstance covered by the above representations.

### 13.    MISCELLANEOUS

13.1    This Agreement sets forth the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes any other agreements between Employee and Schenker written or oral. None of the parties shall be bound by nor shall be deemed to have made any representations or warranties except those contained herein. No change or modification of this Agreement shall be valid unless put in writing and executed by the parties hereto.

13.2    No waiver or purported waiver of any provision of this Agreement shall be valid unless in writing and signed by the party to be charged.

13.3    All representations, warranties and covenants of Employee contained in this Agreement are strictly relied upon by Schenker and shall survive the termination of this Agreement and continue in full force and effect hereunder.

13.4    This Agreement shall be assignable by Schenker to its successor, or to any company into which it is liquidated or with which it is merged, which company shall succeed to all of Schenker's interest, rights, duties and obligations hereunder.

D 0045

11

 

13.5    This Agreement shall be governed in accordance with the laws of the State of New York. If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable and carried into effect.

13.6    In any action or proceeding to enforce this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorney fees. The prevailing party shall mean the party in whose favor the court rules. If the party brings more than one claim, the party must prevail on the majority of the claims brought (in both number and dollar value) in order to be deemed a prevailing party for purposes of this Paragraph. It is further agreed that, in an effort to minimize the expenses of any such litigation, both parties waive any right they may have to a trial by jury in any litigation relating to a claimed breach of this employment contract, or any other dispute arising out of Employee's employment by Schenker, or the termination thereof, including claims of employment discrimination under state or federal law.

13.7    This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic copies of such signed counterparts may be used in lieu of the originals for any purpose.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above set forth.

SCHENKER, INC.

By: _____

Al Marino, Sr.

D 0046

12

The undersigned hereby approve and agree to Section 1

Almar International, Inc.

By _____

Victoria Line, Inc.

By _____

D 0050

13

# EXHIBIT B

## Commission Schedule

Commission on general freight customers as listed on Exhibit A will be paid at a rate of 15% of gross profit, paid monthly, 25 days after month's end.

Commission on warehouse and distribution customers as listed on Exhibit A will be paid at a rate of 7.5% of gross profit paid monthly, 25 days after month end.

If at any time in a 12-month period beginning December 1, 2000 Employee's commission exceeds $300,000, any additional commissions will be computed at a 10% rate for general freight and at a 5% rate for warehouse and distribution for the remainder of the 12-month period.

Sales are defined as amounts invoiced to customers on the Exhibit A and any adjustments to these invoiced amounts. Gross profit is defined as sales minus cost of materials, merchandise and services, including outside services rendered by sub-forwarders, warehousing companies, haulage contractors, consignors, as custom duties, and import duties, collections for goods sent C.O.D. Cost of materials, merchandise and services include all acquisition costs for materials, merchandise and outside service used to directly generate revenue.

D 0047



## EXHIBIT C

### Commission Schedule for New Sales

### New Business, Gross Profit Generated:

-Above 1.5 times Employee's Annual Salary:    7.5% commission on Gross Profit

-Above 3 times Employee's Annual Salary:    10% commission on Gross Profit

SCHENKER INC.

By: _____

Patrick Moebel
President

2/12/01
Date

_____

Alberto J. Mariño, Sr.

01-02-01
Date

D 0052

## SUBLEASE

This sublease agreement is entered into the __30__ day of November, 2000 by Almar International, Inc., a Florida corporation, having offices at 10400 NW 21st Street, Miami, Florida, referred to as in this sublease as "Sublessor," and Schenker, Inc., a New York corporation, having offices at 150 Albany Avenue, Freeport, NY, referred to as "Sublessee."

## RECITALS

By a lease dated August 20, 1998 between International Place Associates III, Ltd. (the "Landlord") as lessor, and Sublessor as lessee (the "Master Lease") Landlord leased certain premises to Sublessor. A copy of such lease is attached as Exhibit A and made a part of this Sublease, and referred herein as the "Master Lease"; and,

Sublessor desires to sublease to Sublessee, on the terms and conditions stated in this Sublease, the Premises described in Exhibit B, which is attached and made a part of this Sublease, and referred to herein as the "Subleased Premises."

Therefore, in consideration of the mutual covenants and agreements contained in this sublease, Sublessor and Sublessee agree and covenant as follows:

1.      SUBLEASED PREMISES  Sublessor subleases to Sublessee the Subleased Premises, and Sublessee hereby sublets from Sublessor the Subleased Premises for the term and according to the conditions contained in this Sublease.

2.      TERM  This Sublease shall be for a term of 5 years commencing on January 1, 2001 and terminating on December 31, 2005, unless sooner terminated or extended as specified under the terms of this Sublease.

3.      RENT  During the term of this Sublease, the Base Monthly Rental for the Subleased Premises shall be payable in advance on the first day of each month until the end of such term pursuant to the Base Rental Schedule attached hereto as Exhibit C. Sublessee shall also pay such Additional Rent as defined in Section 2.3 of the Master Lease. It is agreed that in the event Landlord approves this Sublease, that Sublessee shall pay the Base Monthly Rent and Additional Rent directly to Landlord and that Landlord by approving this Sublease, agrees to accept said payments directly from Sublessee.

4.      OTHER CHARGES  Sublessee shall pay, if applicable, when due, all charges for water, electricity, gas, and/or other utility services furnished to the Subleased Premises during the term of this Sublease.

5.      USE OF PREMISES  Sublessee covenants and agrees (a) to use the Subleased Premises for general office and warehouse purposes only, (b) not to allow said Sublease Premises to be used for any purpose that will increase the rate of insurance thereon, nor for any purpose other than that hereinabove specified, and (c) otherwise in

1

EXHIBIT
2

accordance with the terms and conditions of the Master Lease and further covenants not to do any act which will result in a violation of the terms of the Master Lease.

6.  ASSIGNMENT  Sublessee shall not, without the prior written consent, not to be unreasonably withheld, of Sublessor and of Landlord, assign the term demised by this Sublease, nor suffer or permit it to be assigned by operation of law or otherwise, nor shall Sublessee, without the prior written consent, not to be unreasonably withheld, of Sublessor and of Landlord, sublet all or any part of the Subleased Premises or permit the Subleased Premises. Notwithstanding any permitted assignment, subletting or use, Sublessee shall at all times remain directly, primarily and fully responsible for the payment of rent and any other charges hereunder and for compliance with all of Sublessee's other obligations under the terms and provisions of this Sublease and the Master Lease.

7.  INCORPORATION OF MASTER LEASE  This Sublease is subject to all of the terms and conditions of the Master Lease, except as set forth in this Sublease. Sublessee shall assume and perform the non-monetary obligations of Sublessor as tenant in the Master Lease to the extent the terms and conditions are applicable to the Subleased Premises, and pay rent as set forth in Section 5 of this Sublease. Sublessor shall assume and perform the non-monetary obligations of lessor in the Master Lease to the extent the terms and conditions are applicable to the Subleased Premises. Neither Sublessor nor Sublessee shall commit or permit to be committed on the Premises as defined in the Master Lease any act or omission that shall violate any term or condition of the Master Lease or breach the terms of the Master Lease or cause the Master Lease to be terminated.

8.  CONDITION OF THE PREMISES  Sublessee shall have the option if it so chooses, to inspect the Subleased Premises prior to execution of this lease. After said inspection, if Sublessee is satisfied with the condition of the Premises, Sublessee accepts the Subleased Premises in their condition as of the date of this Sublease, and shall deliver them to Sublessor in the same condition, normal wear and tear excepted, at the expiration of the term of this Sublease.

9.  REPRESENTATION OF SUBLESSOR  Sublessor hereby represents and warrants that the term of Master Lease ends on June 30, 2009, and Sublessor hereby agrees to indemnify and hold Sublessee harmless with respect to any damages, losses and expenses that Sublessee may incur or suffer arising from Sublessor's breach of such representation and warranty.

10.  INSURANCE  Sublessee shall at all times during the term hereof, carry Public Liability and Property Damage insurance with a combined single limit of one million dollars (1,000,000) with companies that are reasonably satisfactory to Sublessor, and Sublessee and such parties as Sublessor designates in writing shall be named as an additional insured in such policy or policies.  Sublessee shall furnish Sublessor with certificates of insurance satisfactory to Sublessor of the extent of such insurance.

2

11.  INDEMNIFICATION  Sublessee agrees to defend, indemnify, and hold Sublessor harmless from and against any and all claims arising out of or as a result of the occupancy or use of the Subleased Premises by Sublessee, its employees, agents or contractors, except to the extent such claims arise form the negligence or intentional misconduct of Sublessor.

12.  HAZARDOUS MATERIAL  Sublessee shall not keep or use or allow to be kept or used on the Subleased Premises, any hazardous materials or inflammable or explosive liquids or materials, except those office products generally used for office supplies, equipment and general office cleaning.

13.  ALTERATIONS BY SUBLESSEE  Sublessee is hereby given permission to make the alterations to the Subleased Premises in accordance with Exhibit C attached hereto. It is understood that such alterations shall cost Sublessee in excess of $350,000 and that upon completion of such alterations, the Subleased Premises are benefited by such alterations. Therefore, in consideration of Sublessor and Landlord giving their consent to such alterations, Landlord by signing a copy of this Sublease hereby agrees to such alterations with the understanding that said alterations remain with the sublet premises and are not to be removed by Sublessee or Sublessor. Rather, said alterations shall become the property of Landlord.

13.  CONSENT OF LANDLORD  Upon execution of this Sublease by both Sublessor and Sublessee, the executed Sublease shall be forwarded to Landlord for Landlord's review and written approval. This Sublease shall not be effective until written approval by Landlord is received by Sublessor and Sublessee. If Landlord's approval is not given within thirty (30) days after Sublessee's execution of this Sublease, either party shall have the option to terminate this Sublease.

14.  NON-DISTURBANCE  Notwithstanding anything to the contrary in Article 14 of the Master Lease or this Sublease, or elsewhere in this Sublease, Sublessee agrees to the condition of Article 14 provided that any such successor landlord or mortgage agrees that so long as no default exists by Sublessee under this Sublease beyond any applicable notice and cure period, such successor shall not name Sublessor nor Sublessee in any foreclosure proceeding and shall not disturb Sublessee and this Sublease shall continue in full force and effect, in which event Sublessee shall attorn to such successor.

15.  QUIET ENJOYMENT  If and so long as Sublessee pays the rent and performs all other terms and conditions hereof on the part of Sublessee to be performed, Sublessee shall quietly enjoy the Premises during the Term without hindrance by any one claiming by, through or under Landlord, subject, however, to the terms of this Lease. Further, in the event that Sublessor defaults under the Master Lease, Landlord shall notify Sublessee of the default by Sublessor and thereafter Landlord hereby agrees to continue to accept all rent directly from Sublessee and shall afford Sublessee the opportunity to remedy any outstanding default of Sublessor.

3

16.    **RENEWAL OPTION**    Provided that the Sublessee is not in default with respect to any of the terms or provisions of this Sublease, Sublessee shall have the option to renew this Sublease for an additional 3 ½ year period commencing January 1, 2006 and ending on June 30, 2009, on the same terms and conditions set forth in this Sublease and pursuant to the Base Rental Schedule for the Option Term attached hereto as Exhibit "A", provided, however, that Sublessee must provide written notice of its exercise of such option on or before October 31, 2005.

17.    **SECURITY**    As security for performance of its obligations hereunder, upon execution of this Sublease, Sublessee has paid to Sublessor and agrees to maintain hereafter, a security deposit of Sixty Thousand Dollars ($60,000), receipt of which is hereby acknowledged by Sublessor.    Upon the occurrence of any default under the Sublease, Sublessor may from time to time and without prejudice to any other remedy, use the security deposit to the extent necessary to make good any arrears of the rent due hereunder, or any other damage, injury, expense or liability caused to Sublessee by such Event of Default.  The remaining balance of such security shall be returned by Sublessor to Sublessee within 15 days after termination of this Sublease and payment of all amounts due hereunder.

18.    **NOTICES**    All notices or other communications required or permitted hereunder shall be in writing and shall be hand-delivered or sent by guaranteed overnight delivery service or by registered or certified mail, return receipt requested, postage prepaid, addressed as set forth below, or at such other address as any party may provide by notice to the other parties in accordance herewith.  All such communications shall be deemed to be given when received.

<u>If to Sublessor:</u>

     Almar International, Inc.

     ~~10308~~ NW 21st Street

     Miami, FL

     Attention: <u>Alberto J. Marino</u>

<u>With a required copy to:</u>

     _____

     _____

     _____

     Attention: _____

If to Sublessee:

> Schenker, Inc.
>
> 150 Albany Avenue
>
> Freeport, NY 11520
>
> Attention: _____

With a required copy to:

> Schenker, Inc.
> 10605 NW 21st Street
> Miami, Florida 33172
> Attention: Walter Monasterio

19.   **BROKERS**   Sublessor and Sublessee represent that they have dealt directly with and only with Codina Realty Services, and neither party knows of no other broker who negotiated this Sublease or is entitled to any commission in connection herewith. Each party agrees to indemnify, defend and hold harmless the other form and against any commissions or claims by any other broker or brokers pertaining to this Sublease. Sublessee shall be responsible for paying the commission, if any, to the broker.

20.   **MISCELLANEOUS**   This Sublease and the attached exhibits:

(a)   Contain the entire agreement of the parties with respect to the indicated subject matter;

(b)   May not be amended or rescinded except by an instrument in writing executed by each of the parties and Landlord;

(c)   Shall inure to the benefit of and bind the successors and permitted assigns of the parties.

IN WITNESS, the parties have duly executed this Sublease as of the day and year first written above

ALMAR INTERNATIONAL, INC.

By: _____

SCHENKER, INC.

By: _____ D. KASPRZYK
EVP, CFO

### JOINDER AND CONSENT BY LANDLORD

The undersigned, being the Landlord under the Master Lease (as defined in the within Sublease Agreement), hereby consents to the Sublease of the sublet Premises by Sublessor to Sublessee on the terms and conditions set forth in the Sublease. Landlord's consent to the Sublease is subject to Sublessor remaining liable under the Master Lease.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned has duly executed this Joinder and Consent on the 6TH day of DECEMBER, 2000.

_____, a Florida _____

by its sole general partner

_____, a Florida _____

By: _____

Name: Edward W Easton
Title: president

Exhibit "B"

[Legal Description].

## <u>CUT-OUT PARCEL 1</u>

THE NORTH 383.00 FEET OF LOT 2, TOGETHER
WITH THE WEST 304.87 FEET OF LOTS 3 and 4
ALL IN BLOCK 4, "INTERNATIONAL CORPORATE
PARK SECTION 3", AS RECORDS IN PLAT BOOK
149 AT PAGE 93 OF THE PUBLIC RECORDS
OF DADE COUNTY, FLORIDA: LESS ALL
THAT PORTION OF SAID LOT 4 LYING SOUTH
OF A LINE 361.86 FEET SOUTH OF AND
PARALLEL WITH THE NORTH LINE OF THE
WITHIN MENTIONED BLOCK 4.

BUILDING 16

3.87 ACRES



## Exhibit "C"

### Base Rental Schedule For Sublease Between Schenker, Inc. and Almar International, Inc.

| Initial Sublease Term | Base Rent (P/SF)* | | Base Annual Rent** | | Base Rent/ Month | | Gross SF |
|---|---|---|---|---|---|---|---|
| 1/1/00 - 7/31/01 | $ | 8.60 | $ | 665,340.76 | $ | 55,445.06 | 100,800.00 |
| 8/1/01 - 7/31/02 | $ | 8.83 | $ | 688,627.69 | $ | 57,385.64 | 100,800.00 |
| 8/1/02 - 7/31/03 | $ | 7.07 | $ | 712,729.66 | $ | 59,394.14 | 100,800.00 |
| 8/1/03 - 7/31/04 | $ | 7.32 | $ | 737,675.19 | $ | 61,472.93 | 100,800.00 |
| 8/1/04 - 7/31/05 | $ | 7.57 | $ | 763,493.83 | $ | 63,624.49 | 100,800.00 |
| 8/1/05 - 12/31/05 | $ | 7.84 | $ | 790,216.11 | $ | 65,851.34 | 100,800.00 |

| Option Term | Gross Rent (P/SF) | | Gross Annual Rent | | Gross Rent / Month | | Gross SF |
|---|---|---|---|---|---|---|---|
| 1/1/06 - 7/31/07 | $ | 8.11 | $ | 817,873.67 | $ | 68,156.14 | 100,800.00 |
| 8/1/07 - 7/31/08 | $ | 8.40 | $ | 846,499.25 | $ | 70,541.60 | 100,800.00 |
| 8/1/08 - 7/31/09 | $ | 8.69 | $ | 876,126.73 | $ | 73,010.56 | 100,800.00 |

* Rent is assumed with increases at 3.5%. Actual increases in Base Rent are based upon CPI capped at 3.5%.
** Base Annual Rent does not include Additional Rent or State Sales Tax a defined in the Master Lease.

JS 44
(Rev 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS
**Alberto Marino**

## DEFENDANTS
**Schenker, Inc.**

04-20234

CIV-UNGARO-BENAGES

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Miami-Dade, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Suffolk, NY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Michael Reppas, Esq.
Fowler, Rodriguez & Chalos, LLP
Gables International Plaza
2655 LeJeune Road, Suite 805
Coral Gables, Florida, 33134

ATTORNEYS (IF KNOWN)
Marilyn J. Holifield, Esq.
Holland & Knight, LLP
701 Brickell Avenue, Suite 3000
P.O. Box 015441
Miami, FL 33131

MAGISTRATE JUDGE
BROWN

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. GOVERNMENT NOT A PARTY)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)
(PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Fraud, wrongful termination and age and national origin discrimination and retaliation in violation of Florida Civil Rights Act.

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | PERSONAL INJURY | TORTS — PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury—Med Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 650 Airline Regs | ☐ 840 Trademarks | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 660 Occupational Safety/Health | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | | LABOR | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☒ 442 Employment | Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION   ☐ UNDER F.R.C.P. 23
DEMAND $
Check YES only if demanded in complaint
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
Judge King
Docket Number 02-23409-CIV-KING

Date 1/30/04
SIGNATURE OF ATTORNEY OF RECORD

United States District Court

Recpt # 845742   $150.00

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. Plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c) Attorneys. Enter firm name, address, telephone number, and attorney or record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedent over diversity cases.)

**III. Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**V. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**VI. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

**VII. Requested In Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VII. Related Cases.** This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature:** Date and sign the civil cover sheet.

# 1560425_v1